# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-JP-00121-SCT

*MISSISSIPPI COMMISSION ON JUDICIAL PERFORMANCE*

*v.*

*CARLOS E. MOORE, MUNICIPAL COURT JUDGE*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/24/2024 |
| TRIAL JUDGE: | HON. DAVID RYAN BRUHL |
| COURT FROM WHICH APPEALED: | MISSISSIPPI COMMISSION ON JUDICIAL PERFORMANCE |
| ATTORNEYS FOR PETITIONER: | ASHLEY MAY<br>RACHEL L. WILSON |
| ATTORNEYS FOR RESPONDENT: | TERRIS C. HARRIS<br>JEFFREY M. GRAVES |
| NATURE OF THE CASE: | CIVIL - JUDICIAL PERFORMANCE |
| DISPOSITION: | REMOVAL FROM THE BENCH; FINE OF $3,000 - 01/16/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.   The Mississippi Commission on Judicial Performance (the Commission) brings this case against Municipal Court Judge Carlos Moore relating to social media posts and public comments by Moore that they allege violated Article 6, Section 177A, of the Mississippi Constitution, the Code of Judicial Conduct and a Memorandum of Understanding (MOU) between the Commission and Judge Moore.  This Court finds that Judge Moore's actions are

in violation of the Mississippi Constitution, the judicial-conduct canons and the MOU. Judge Moore is hereby removed from the bench and assessed a $3,000 fine plus costs.

## FACTS AND PROCEDURAL HISTORY

¶2. The facts are not in dispute. Judge Moore was appointed to be municipal judge for the City of Clarksdale in July 2017. In May 2020, Judge Moore was named municipal judge for the City of Grenada. The formal complaint at issue stems from allegations of misconduct involving Judge Moore's use of social media in 2021 and 2022.

¶3. Prior to those posts, on December 16, 2019, the Commission sent Judge Moore a letter stating that a complaint had been received regarding Judge Moore's posting on Facebook or other social medial outlets "information about cases you heard in your court." The Commission advised Judge Moore that "the [judicial-conduct canons] prohibit[] judges from commenting publicly on pending or impending cases in any court, that could affect the outcome or impair its fairness."

¶4. Thereafter, Judge Moore maintained a Facebook page under the name "Judge Carlos Moore" with a profile picture of Judge Moore "in his robe in court and seated at his judicial bench." Judge Moore had also "post[ed] videos, images, and narratives that c[ould] be perceived or viewed as advertising his law practice from his profile."

¶5. In addition, Judge Moore maintained a Twitter (now known as X) account with the handle "Esquiremoore" and the display name "Judge Carlos Moore" that contained similar posts. Judge Moore's Twitter page had "a plethora of posts commenting on current political

2

issues." Judge Moore agreed that his Twitter account could "be perceived as an endorsement of a candidate for public office."

¶6.     On December 1, 2020, Judge Moore and the Commission entered into a Memorandum of Understanding (MOU) in which Judge Moore agreed to the following:

> Respondent shall take all reasonable and necessary steps to ensure that his posts on social media do not lend the prestige of his office to advance the private interests of his law practice or other non-judicial activities. Respondent shall remove all posts from his government official Facebook page that does not involve court business. The only posts that shall be displayed on his official Facebook page must contain information useful to the parties in that court such as the operating hours, dockets, clinics, dress code, and a directory. Respondent shall not post any advertisements, such as pictures, videos, or commercials for his law firm, his position as President of the National Bar Association on this page, or any other personal interests. However, Respondent may post judicial news, commentary, historical and current judicial events, as provided by Canon 4B of the Code of Judicial Conduct.

> Respondent shall no longer use the display name "Judge Carlos Moore" for his twitter account; however, Respondent may use his Twitter handle "Equiremoore."

> The parties agree that any future violation of the conditions or the terms of this [MOU] could result in this cause being considered by the Commission as an aggravating factor in any future proceeding pursued on similar grounds.

¶7.     Judge Moore, however, did not comply with the terms of the MOU as he continued posting under the name "Judge Carlos Moore" with a profile picture of him in his judicial robes and a subtitle of "President at National Bar Association."

¶8.     On November 20, 2021, Judge Moore posted on social media the following comment:

> If anyone still believes justice is blind in America after the Kyle Rittenhouse acquittals yesterday, you just refuse to accept an ugly truth. I can almost guarantee you that if Kyle had been black and killed two white men in the same manner Kyle did, he most certainly would have been convicted.

3

> There has never been a greater need for black lawyers and judges in America to keep decrying the blatant inequities that exist in our criminal justice system and to keep pushing for a color blind and more equitable judicial system.

The account name on the post was "Judge Carlos Moore," and the subtitle stated "President at National Bar Association."

¶9.    On June 22, 2022, Judge Moore appeared on The Kelly Clarkson Show to discuss his DO Better ASAP alternative sentencing program.  On the show, when asked why his DO Better ASAP program was so important to him, Judge Moore stated:

> You know, I always felt that if I got in a position of power I would try to make a difference.  So many times African Americans get the short end of the stick.  There are many judges that don't look like me and the people that appear before them. They cannot be empathetic because they don't look like the people that go before them.  But I preside over two jurisdictions where there are African Americans, 85 to 90% of people look like me, and I want to give them a second chance if they qualify.

*The Kelly Clarkson Show:Mississippi Judge Gives Young Offenders Second Chances Thru Do Better ASAP Program* (NBC television broadcast June 22, 2022), https://www.nbc.com/the-kelly-clarkson-show/video/mississippi-judge-gives-young-offenders-second-chances-thru-do-better-asap-program/ACCN563397925.

¶10.    On July 15, 2022, the Commission filed a Formal Complaint against Judge Moore for alleged violation of Article 6, Section 177A, of the Mississippi Constitution.  The Commission found that Judge Moore had violated Canons 1, 2A, 3B(5), 3B(9) and 4A of the Code of Judicial Conduct through his actions on social media and television.  Finally, the Commission alleged that Judge Moore had violated the MOU regarding his Facebook and Twitter accounts.

4

¶11. Judge Moore did not file an answer to the complaint or respond to the Commission's interrogatories, requests for production and requests for admissions. After failed attempts at setting a date for a hearing, an agreed order was entered granting a hearing on the merits by written submission. The agreed order stated that the determination of facts were nonappealable and that only matters of law raised in written submissions shall be appealable. On September 22, 2023, Judge Moore filed his Case-in-Chief and Sworn Written Submission in Lieu of Hearing on the Merits in which he requested that the Commission dismiss the Formal Complaint or, in the alternative, recommend lesser sanctions. Judge Moore argued that the Formal Complaint was an attempt to violate his First Amendment rights.

¶12. On September 29, 2023, the Commission filed its Final Response. The Commission alleged that Judge Moore had violated the MOU:

> by posting violative content on all his social media platforms. He further failed to comply with the [MOU] by failing to change the names and/or deleting non-compliant content from such social media accounts. On and after April 20, 2022, both Respondent's Twitter account and Facebook account utilized the name "Judge Carlos Moore" and both were used to make posts he previously agreed that violated the Code of Judicial Conduct.

¶13. The Commission also alleged the Judge Moore's speech was "racially divisive" and argued that "[j]udges who are partial and without empathy do not promote public confidence in the integrity and impartiality of the judiciary." Further, the Commission argued that judges are prohibited from discussing pending cases, "especially in a forum that may invite public comments about the case."

5

¶14.   On October 20, 2023, the appointed Committee[1] met to review and determine its recommendation. On December 8, 2023, the Commission voted to approve the committee recommendation with unanimous vote, said recommendation being a public reprimand, removal from office, suspension for six years and a $5,000 fine, plus costs.  The Commission brings this recommendation before the Court by way of motion.

## ISSUES PRESENTED

I.     Whether Judge Moore's actions violated Article 6, Section 177A, of the Mississippi Constitution and Canons 1, 2A, 3B(5) and 4A of the Code of Judicial Conduct.

II.    Whether the alleged misconduct warrants the recommended sanctions.

## STANDARD OF REVIEW

¶15.   This Court has "an obligation to conduct an independent inquiry of the record in order to make our final determination of the appropriate actions to be taken in each case. In doing so, we will accord careful consideration to the findings of fact and recommendations of the Commission[.]"   *In re Anderson*, 412 So. 2d 743, 746 (Miss. 1982).  After review of the record, "[t]he Supreme Court may accept, reject, or modify, in whole or in part, the findings and recommendation of the Commission."  Miss. Comm'n on Jud. Performance R.10 E.

## DISCUSSION

**I.     Whether Judge Moore's actions violated Article 6, Section 177A, of the Mississippi Constitution and Canons 1, 2A, 3B(5) and 4A of the Code of Judicial Conduct.**

---

[1]Rule 8 of the Rules of the Mississippi Commission on Judicial Performance allows a committee of the Commission to conduct a formal hearing and make a recommendation to the full Commission.

¶16. As a preliminary matter, no judge is required to simply check their First Amendment rights at the door in order to serve. *Miss. Comm'n on Jud. Performance v. Wilkerson*, 876 So. 2d 1006, 1010 (Miss. 2004). "[T]his Court clearly may not impose sanctions for violation of a Canon where doing so would infringe on rights guaranteed under the First Amendment, including the freedom of speech." *Id.* at 1010. "Where the government seeks to restrain political/public issue speech, it must withstand 'strict scrutiny,' which requires the government to demonstrate that the restraint 'is (1) narrowly tailored to serve (2) a *compelling* state interest." *Id.* at 1011 (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 774-75, 122 S. Ct. 2528, 153 L. Ed. 2d 694 (2002)).

¶17. This Court employs a two-step analysis for evaluating claims of First Amendment violations for public employees. *Miss. Comm'n on Jud. Performance v. Boland*, 975 So. 2d 882, 890 (Miss. 2008) (citing *Scott v. Flowers*, 910 F.2d 201 (5th Cir. 1990)). "First, the court must determine, in light of the 'content, form, and context' of the speech in question, whether it addresses a 'matter of legitimate public concern.'" *Id.* at 891 (citation omitted) (quoting *Scott*, 910 F.2d at 210). Then, the Court "must balance the employee's first amendment rights against the governmental employer's countervailing interest in promoting the efficient performance of its normal functions." *Id.* (quoting *Scott*, 910 F.2d at 210) However, if the speech does not address a matter of legitimate public concern, "the inquiry ends." *Id.* (quoting *Scott*, 910 F.2d at 210).

7

¶18. This Court has noted that these rights are not absolute for those who choose to serve in the judiciary. *Miss. Comm'n on Jud. Performance v. Osborne*, 11 So. 3d 107, 113 (Miss. 2009). The Court has reasoned that

> As a postscript on this issue, we direct our judges to the commentary under Canon 2 of the Mississippi Code of Judicial Conduct, which states in pertinent part:
>
>> Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on the judge's conduct that might be reviewed as burdensome by the ordinary citizen and should do so freely and willingly.
>>
>> No one is compelled to serve as a judge, but once an individual offers himself or herself for service, that individual accepts the calling with full knowledge of certain limitations upon speech and actions in order to serve the greater good. A calling to public service is not without sacrifice, including the acceptance of limitations on constitutionally granted privileges

*Id.* at 114.

¶19. While this case involves social media posts, in addition to televised comments, the First Amendment analysis is the same. Social media posts constitute speech. Likewise, for the purposes of the judicial-conduct canons, social media posts constitute speech.

¶20. Article 6, Section 177A, of the Mississippi Constitution states, in relevant part, that

> On recommendation of the commission on judicial performance, the Supreme Court may remove from office, suspend, fine or publicly censure or reprimand any justice or judge of this state for: (a) actual conviction of a felony in a court other than a court of the State of Mississippi; *(b) wilful misconduct in office*; (c) wilful and persistent failure to perform his duties (d) habitual intemperance in the use of alcohol or other drugs; or *(e) conduct prejudicial to the administration of justice which brings the office into disrepute*[.]

8

Miss. Const. art. 6, § 177A (emphasis added). The Commission maintains that Judge Moore violated Article 6, Section 177A, as his actions amounted to willful misconduct that is prejudicial to the administration of justice and brings the judicial office into disrepute.

¶21. The Commission further maintains that Judge Moore has violated Canon 1, 2A, 3B(5) and 4(A) of the Code of Judicial Conduct. The Commission submits that Judge Moore's violation of the judicial-conduct canons has resulted in a violation of Article 6, Section 177A. *See **Miss. Comm'n on Jud. Performance v. Fowlkes***, 121 So. 3d 904, 907 (Miss. 2013).

¶22. Canon 1 of the Code of Judicial Conduct provides that "**A Judge Shall Uphold the Integrity and Independence of the Judiciary**[.]" The commentary to Canon 1 provides that "[a]lthough judges should be independent, they must comply with the law, including the provisions of this Code. Public confidence in the impartiality of the judiciary is maintained by the adherence of each judge to this responsibility." The Commission argues that Judge Moore has consistently violated Canon 1 during his tenure as a municipal judge. It states that Judge Moore's disregard of the judicial-conduct canons, of warnings by the Commission and of his specific agreement to refrain from actions similar to those before the Court today violates Canon 1.

¶23. Canon 2A states: "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." The Commission avers that Judge Moore has diminished the public's confidence in the integrity and impartiality of the judiciary by making racially charged comments,

utilizing his social media platforms titled "Judge Carlos Moore," violating an agreed MOU and posting about pending cases before him.

¶24.    Under Canon 3B(5),

> A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, gender, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not permit staff, court officials and others subject to the judge's direction and control to do so. A judge shall refrain from speech, gestures or other conduct that could reasonably be perceived as sexual harassment and shall require the same conduct of others subject to the judge's direction and control.

The Commission states that Judge Moore's statements are racially charged, evidencing bias or prejudice, and, therefore, violate Canon 3B(5).

¶25.    Lastly, Canon 4A mandates that "[a] judge shall conduct all of the judge's extra-judicial activities so that they do not: (1) cast reasonable doubt on the judge's capacity to act impartially as a judge; (2) demean the judicial office; or (3) interfere with the proper performance of judicial duties."   The Commission contends that Judge Moore "made disparaging insults, that were racially divisive, utilizing his position as a judge[.]" It is the Commission's position that "[b]lasting racially disparaging divisive comments to the world renders anyone who reads Judge Carlos Moore's comments his target and sufferer of harm." They argue that these comments put the general public in doubt of the impartiality of the Mississippi judiciary, specifically Judge Moore himself.

10

¶26. We examine two of the Commission's allegations of misconduct.[2]

### 1. Televised Comments

¶27. On June 22, 2022, Judge Moore was featured on The Kelly Clarkson Show as a part of her "Rad Human" segment to discuss his DO Better ASAP alternative sentencing accountability program. During the segment, Judge Moore made the following statement:

> You know, I always felt that if I got in a position of power I would try to make a difference. So many times African Americans get the short end of the stick. *There are many judges that don't look like me and the people that appear before them. They cannot be empathetic because they don't look like the people that go before them.* But I preside over two jurisdictions where there are African Americans, 85 to 90% of people look like me, and I want to give them a second chance if they qualify.

*The Kelly Clarkson Show: Mississippi Judge Gives Young Offenders Second Chances Thru Do Better ASAP Program* (NBC television broadcast June 22, 2022) (emphasis added), https://www.nbc.com/the-kelly-clarkson-show/video/mississippi-judge-gives-young-offenders-second-chances-thru-do-better-asap-program/ACCN563397925.

¶28. The Commission argues that these were racially charged comments made by Judge Moore while holding himself out as a judge. They argue that these comments are racially divisive and diminish the public's confidence in the integrity and impartiality of the judiciary. The Commission alleges these comments violate the above-referenced canons.

¶29. Judge Moore contends that he has not violated either the Mississippi Constitution or the canons, and he further argues that these comments are protected speech under the First

---

[2]The Commission alleges a third violation involving Judge Moore's public post about a defendant in his DO Better ASAP program. Because this Court finds no misconduct occurred, we do not address that claim or Canon 3B(9).

Amendment.[3]  He posits that his comments dealt with a matter of public concern and that the restraint on his speech does not survive the strict-scrutiny requirement, i.e., that the "restraint 'is (1) narrowly tailored to serve (2) a *compelling* state interest.'" ***Wilkerson***, 876 So. 2d at 1011 (quoting ***White***, 536 U.S. at 774-75).

¶30.    Discussions about racial disparity in the legal system or the desire for greater diversity in the judiciary and legal profession are certainly matters of public concern. However, blatantly attacking an entire race's ability to exhibit a core, not just judicial but human, ability is not.[4]  Likewise, intimating that you will right past racial injustices with future decisions based on race is contrary to the principles of racial equality in the judicial system.

¶31.    This Court takes particular issue with Judge Moore's statements that "[t]hey cannot be empathetic because they don't look like the people that go before them" and "[b]ut I preside over two jurisdictions where there are African Americans, 85 to 90% of people look like me, and I want to give them a second chance if they qualify."

¶32.    Regarding the first comment, its meaning is clear and unmistakable: judges who are not African American cannot be empathetic to African Americans. It is simply an attack on all judges of a particular race(s).  Despite the fact that the statement's meaning is clear, the

---

[3]It is important to note that Judge Moore does not allege some type of misunderstanding or a "slip of the tongue."  Nor does he apologize for his remarks as being improper coming from a member of the judiciary.

[4]Merriam-Webster defines "empathy," in part, as "the action of understanding, being aware of, being sensitive to, and vicariously experiencing the feelings, thoughts, and experience of another." *Empathy*, Merriam-Webster Dictionary (2024).

context in which it was given removes all reasonable doubt.[5]  While the second statement could be read not to exclude others, given the context of the sentence, it is clear that Judge Moore intends to use his "position of power" to make amends to those who have historically gotten "the short end of the stick."

¶33.    We agree with the Commission that Judge Moore's statements violate Canon 1 (Judge Moore did not uphold the integrity of the judiciary), Canon 2A (Judge Moore's comments did not promote, but rather hampered, public confidence in the integrity and impartiality of the judiciary), Canon 3B(5) (Judge Moore's racially charged comments evidence bias or prejudice) and Canon 4A (Judge Moore's comments demeaned the judicial office and cast doubt upon his capacity to act impartially).  Further, we find that these comments are "prejudicial to the administration of justice which brings the office into disrepute."  Miss. Const. art. 6, § 177A.

¶34.    We disagree with Judge Moore's assertion that his statements, when spoken in his judicial capacity and given the context of the statements, are protected by the First Amendment.  It is disingenuous for Judge Moore to claim First Amendment protection by couching statements as being about a matter of public concern and then to use that protection to call into question the ability of a large portion of the judiciary to do its job while intimating a second chance for those who share his physical characteristics.

---

[5]Interestingly enough, Judge Moore did not state or imply that there would be any problem with his ability to be empathetic to defendants who "don't look like" him.

¶35.   In *Boland*, Judge Boland, while attending a National Drug Court Institute certification seminar in her capacity as a judge, made a number of inappropriate comments. *Boland*, 975 So. 2d at 885-86.   While exonerating her on several comments as evincing her personal opinion, this Court found that her comment that African Americans in Hinds County could "go to hell for all I care"  constituted judicial misconduct.   *Id.* at 891 (internal quotation marks omitted).  This Court found that "Judge Boland was acting in her capacity as a justice court judge[.]" *Id.* at 892.  The Court rejected Judge Boland's argument that her comments were of public concern and found that the comments were instead "disparaging insults[.]" *Id.*  The Court concluded that "[t]he statement placed Judge Boland's impartiality at issue" and found that her conduct "constituted willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute[.]" *Id.* at 896, 898.

¶36.   Likewise, in *Osborne*, while campaigning for reelection, Judge Osborne, speaking at a meeting of the Greenwood Voters League, a predominantly African American political organization, stated that "[w]hite folks don't praise you unless you're a damn fool.  Unless they think they can use you.  If you have your own mind and know what you're doing, they don't want you around." *Osborne*, 11 So. 3d at 109.  Similar to the *Boland* case, "Judge Osborne was appearing at the meeting in his capacity as a judge[.]" *Osborne*, 11 So. 3d at 113.  This Court found Judge Osborne's "commentary on Caucasian officials and their African-American appointees in his jurisdiction" not to be a matter of legitimate political concern in his reelection campaign but, rather, to be "merely an expression of his personal

14

animosity." ***Id.*** The Court, echoing ***Boland***, found that the "comments 'were disparaging insults and not a matter of legitimate public concern.'" ***Id.*** at 114 (quoting ***Boland***, 975 So. 2d at 892).

¶37. Judge Moore's comments are akin to those in ***Boland*** and ***Osborne.*** Like ***Boland*** and ***Osborne***, Judge Moore was appearing in his capacity as a judge. ***Boland***, 975 So. 2d at 892; ***Osborne***, 11 So. 3d at 113. While couching his comments under a legitimate topic of concern, he proceeded to simply attack members of the judiciary based on their race and made additional comments that brought into question his ability to remain impartial based upon racial motivations. The comments are not matters of legitimate public concern but simply constitute invidious, disparaging, racially charged statements meant to serve no legitimate purpose.

### 2.   *Rittenhouse Comments*

¶38. On November 20, 2021, Judge Moore posted the following content related to the Kyle Rittenhouse trial:

> If anyone still believes justice is blind in America after the Kyle Rittenhouse acquittals yesterday, you just refuse to accept an ugly truth. I can almost guarantee you that if Kyle had been black and killed two white men in the same manner Kyle did, he most certainly would have been convicted. There has never been a greater need for black lawyer and judges in America to keep decrying the blatant inequities that exist in our criminal justice system and to keep pushing for a color blind and more equitable judicial system.

¶39. The Commission argues this post includes "no discussion of evidence, only statements regarding race." The Commission submits that this comment violates Canons 1 and 2A, as it is used under his account name "Judge Carlos Moore" for a social media post not

15

authorized under Canon 4B or in compliance with the terms of the MOU. Further, the Commission argues that Judge Moore violated Canon 3B(5) by making racially charged posts while representing himself as a judge. Further, the Commission argues generally that Canon 4A has been violated because "Judge Moore's action demeaned his judicial office, cast doubt on his ability to act impartially and interfered with the proper performance of his judicial duties."

¶40. Judge Moore maintains that this statement does not violate the judicial-conduct canons. He compares his post to Justice Stephen Breyer's writing in "Making Our Democracy Work." Stephen Breyer, *Making Our Democracy Work: The Yale Lectures*, 120 Yale L.J. 1999 (2011). Judge Moore argues that his comments are no different than Justice Breyer's, who, as Judge Moore summarizes, "expounded upon the Court's imperative to uphold public trust and proposed the interpretation of the Constitution in a manner that aligns with practicality." Judge Moore maintains that his post, similarly, contained his expressions of the inequalities in the criminal justice system and the need for black judges and lawyers to advocate for a fairer judicial system.

¶41. First, the comments are clearly a violation of the MOU entered into between Moore and the Commission. The MOU is an enforceable document. It is an authorized disposition of a case before the Commission as set forth in Rule 6B(3) of the Rules of the Mississippi Commission on Judicial Performance. In this case, Moore and the Commission agreed to dispose of a prior Formal Complaint by entry into the MOU. Moore neither disputes voluntarily entering into the MOU nor the actions alleged by the Commission to have

16

violated the MOU. He merely contests whether the actions do, in fact, violate the MOU or, alternatively, are protected under the First Amendment.

¶42.    This Court finds that Judge Moore's comments regarding the Rittenhouse trial clearly and unequivocally violated the terms of his agreed MOU with the Commission. In the MOU, Judge Moore agreed that the only posts he would display on his "Judge Carlos Moore" Facebook page would contain "information useful to the parties in that court such as the operating hours, dockets, clinics, dress code, and a directory." The only exception was for content that aligned with Canon 4B. Canon 4B allows a judge to "speak, write, lecture, teach and participate in other extra-judicial activities concerning the law, the legal system, the administration of justice and non-legal subjects, subject to the requirements of this Code." Judge Moore and the Commission agreed that his only other posts may be about "judicial news, commentary, historical and current judicial events, as provided by Canon 4(B)[.]" This, in and of itself, is a violation of the canons.

¶43.    Judge Moore's main argument is that the comments are protected by the First Amendment. This Court recognizes that Moore's post, given in a capacity as a private citizen or, dependent on the circumstances, by an uninvolved attorney, might qualify as a protected opinion on a legitimate matter of public concern. *See Wilkerson*, 876 So. 2d 1007. As stated above, however, judges accept restrictions on their conduct when acting as a judge that might be viewed as a burden to the ordinary citizen. *Osborne*, 11 So. 3d at 114. A judicial calling is not without sacrifices, including some limitations on the exercise of

17

constitutionally granted privileges. *Id.* This is the part that Judge Moore continually fails to grasp.

¶44.    As in *Boland* and *Osborne*, Judge Moore held himself out as a judge while making his comments on social media and The Kelly Clarkson Show. In this case, he did so on social media using an account named "Judge Carlos Moore." As with the comments on The Kelly Clarkson Show, Judge Moore couched his comments under the pretense of discussing a matter of legitimate public concern, racial injustice and the need for more black lawyers and judges in this country. In the Rittenhouse comments, just as he did on The Kelly Clarkson Show, he then proceeded to make racially charged attacks based on race, this time stating that he could "almost guarantee," if the racial circumstances had been different, "he most certainly would have been convicted."

¶45.    We find Moore's statements to be similar to those made in *Osborne*. Osborne's statement was, "[w]hite folks don't praise you unless you're a damn fool. Unless they think they can use you. If you have your own mind and know what you're doing, they don't want you around." *Osborne*, 11 So. 3d at 109. Osborne's comments were in the context of questioning "Caucasian officials and their African-American appointees[.]" *Id.* at 113. The topic, how public officials of a certain race might treat or deal with those of a different race over whom they might have some level of authority, would certainly seem to be a legitimate public concern. Judge Osborne's comments, however, were not. *Id.* Just as we did with Judge Osborne, we find Judge Moore's comment to be "merely an expression of his personal

18

animosity." *Id.* We find Judge Moore's comments more closely resemble Judge Osborne's public comments than Justice Breyer's law-journal article.

¶46.   This Court has previously defined willful misconduct in office as "the improper or wrongful use of the power of his office by a judge acting intentionally, or with gross unconcern for his conduct, and generally in bad faith." *In re Anderson*, 412 So. 2d at 745 (quoting *In re Nowell*, 237 S.E.2d 246, 255 (N.C. 1977)).  We agree with the Commission that Judge Moore's comments constitute a violation of the judicial-conduct canons and that, standing alone but certainly in conjunction with his clear violation of the MOU previously entered into by agreement, evince "wilful misconduct in office[.]" Miss. Const. art. 6, § 177A.

> ## II.      Whether the alleged misconduct warrants the recommended sanctions.

¶47.   "This Court has the sole authority to impose sanctions for judicial misconduct." *Miss. Comm'n on Jud. Performance v. Harris*, 131 So. 3d 1137, 1141 (Miss. 2013) (citing *In re Anderson*, 412 So. 2d at 746).  "The primary purpose of judicial sanctions is not punishment of the individual judge but 'to restore and maintain the dignity and honor of the judicial office and to protect the public against future excesses.'" *Osborne*, 11 So. 3d at 116 (quoting *Miss. Comm'n on Jud. Performance v. Guest*, 717 So. 2d 325, 329 (Miss. 1998)).

> The appropriateness of sanctions is weighed based on the following factors: (1) the length and character of the judge's public service; (2) whether there is any prior caselaw on point; (3) the magnitude of the offense and the harm suffered; (4) whether the misconduct is an isolated incident or evidences a pattern of conduct; (5) whether moral turpitude was involved; and (6) the presence or absence of mitigating or aggravating factors

19

*Miss. Comm'n on Jud. Performance v. Boone*, 60 So. 3d 172, 185 (Miss. 2011) (citing *Miss. Comm'n on Jud. Performance v. Gibson*, 883 So. 2d 1155, 1158 (Miss. 2004), *overruled on other grounds by* **Boone**, 60 So. 3d at 177).

### 1. The Length and Character of the Judge's Public Service

¶48. Judge Moore was appointed a municipal judge for the City of Clarksdale in July 2017 and for the City of Grenada in May 2020. Judge Moore states to this Court that he did not intend his comments to bring disrepute to the judiciary. He urges this Court to consider the national praise he received from The Kelly Clarkson Show and the grant from The Walmart Foundation to the National Judicial College that "resulted in large measure" from his DO Better ASAP second chance program. Judge Moore also urges this Court to consider the national accolades he has received, including President Joseph Biden's Presidential Lifetime Achievement Award.

¶49. Moore, however, has also had a tumultuous period of service. In addition to the issues in this case, Judge Moore has been publicly reprimanded, suspended from service and fined. *Miss. Comm'n on Jud. Performance v. Moore*, 356 So. 3d 122 (Miss. 2023). The Commission has also produced evidence of public sanctions from the Tennessee State Bar.

### 2. Whether there is any prior caselaw on point.

¶50. Two similar cases of importance, **Boland**, 975 So. 2d 882, and **Osborne**, 11 So. 3d 107, have been discussed at length in this opinion. It is unnecessary to regurgitate the facts here. We find that both of these cases present significant guidance on the issues presented.

### 3. Magnitude of the Offense and the Harm Suffered

¶51.    Judge Moore made comments that questioned the integrity of the entire Mississippi Court system on national television and posted racially divisive comments disparaging the court system on a public social media platform available to the world.  "Undermining the public confidence in the integrity, propriety, and impartiality of the office is an egregious offense." *Osborne*, 11 So. 3d at 117.  Just as in Judge Osborne's case, Judge Moore's comments received widespread publicity in the media.

        4.      *Whether the misconduct is an isolated incident or evidences a pattern of conduct.*

¶52.    As we have already noted, Judge Moore has a prior disciplinary history, both as a judge and as an attorney. The Commission states that Judge Moore was subject to public reprimand in Tennessee in May 2019, in Mississippi in September 2019 and then again in Mississippi in April 2022.[6]  In addition, the Commission sent a letter in December 2019 on his use of social media and entered the MOU with Judge Moore in December 2020.  In addition, Judge Moore has been previously publicly reprimanded, suspended from service and fined as a judge.  *Moore*, 356 So. 3d at 122. The Commission has shown that Judge Moore's misconduct is not an isolated incident.  Judge Moore's actions reveal a repeated misuse of his judicial role and warrants a harsh sanction.

        5.      *Whether moral turpitude was involved.*

---

[6]Additionally, by Opinion and Final Judgment dated December 31, 2024, Moore has been suspended from the practice of law by the Complaint Tribunal.  *See* Opinion and Final Judgment, *Miss. Bar v. Moore*, No. 2024-B-00275 (Miss. Complaint Trib. Dec. 31, 2024). No appeal is pending.

21

¶53. This Court defines moral turpitude as "actions which involve interference with the administration of justice, misrepresentation, fraud, deceit, bribery, extortion, or other such actions which bring the judiciary into disrepute." *Boland*, 975 So. 2d at 897 (internal quotation marks omitted) (quoting *Miss. Comm'n on Jud. Performance v. Just. Ct. Judge T.T.*, 922 So. 2d 781, 786 n.4 (Miss. 2006)). This Court has also found moral turpitude is exhibited when judges fail to uphold the dignity and respect of the judiciary through appropriate conduct and behavior toward others. *Miss. Comm'n on Jud. Performance v. Sanford*, 941 So. 2d 209, 217 (Miss. 2006). Based on these definitions, this Court finds moral turpitude is involved.

> 6. *Presence or Absence of Mitigating or Aggravating Factors*

¶54. The Commission submits Judge Moore's disregard for the judicial-conduct code, the Commission and the Mississippi Supreme Court as an aggravating factor. The Commission points out that Judge Moore agreed to change his social media handle and remove certain content. It alleges that Judge Moore did not comply until July 2022 when this Formal Complaint was filed against him. Further, the Commission argues he was dilatory in his appearance for reprimand in Grenada County and did not participate in this case until trial at which he requested a continuance. The Commission also takes issue with Judge Moore's statement that he is "before the Commission because of comments he made – if made by other Judges would not have risen to this level." Judge Moore does not address aggravating or mitigating factors. We do note, however, proof from the record of community and public

service. Any mitigation is greatly outweighed by Judge Moore's actions and prior transgressions.

**CONCLUSION**

¶55. Judge Moore's actions constituted willful misconduct that was prejudicial to the administration of justice. He has failed to "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Miss. Code of Jud. Conduct Canon 2A. Judge Moore has admitted his actions but continues to argue that he has done no wrong. A great likelihood exists that Judge Moore would continue to repeat his actions. *See Miss. Comm'n on Jud. Performance v. Thompson*, 169 So. 3d 857, 874 (Miss. 2015). Accordingly, a harsh sanction is warranted. *Id.*

¶56. Judge Moore has on multiple occasions been publicly reprimanded, he has once been suspended from office for sixty days and he has been fined $1500. *Moore*, 356 So. 3d at 133. The Commission requests Judge Moore's removal from the bench and a suspension for six years in addition to a $5,000 fine and public reprimand.

¶57. Judge Moore's words were aimed at creating public distrust in the judiciary and its ability to be impartial. Judge Moore, after being warned and agreeing through an MOU to comply with the judicial-conduct canons, willfully continued in his actions that were prejudicial to the administration of justice.

¶58. We find removal from the bench to be the appropriate sanction for Moore's actions. Because this Court has found Judge Moore violated Article 6, Section 177A, removal from the bench is permanent. *Thompson v. Att'y Gen. of Miss.*, 227 So. 3d 1037, 1044 (Miss.

23

2017) ("[W]e hold that the phrase 'removed from office' found in Section 177A of the Mississippi Constitution necessarily means a permanent separation from office, such that an individual judge removed from office remains ineligible to return to it."); *Miss. Comm'n on Jud. Performance v. Darby*, 143 So. 3d 564, 568 (Miss. 2014); Miss. Code Ann. § 9-19-17 (Rev. 2019). Therefore, a suspension is unnecessary.[7]

¶59. Judge Moore is removed from the bench, is fined $3,000 and is assessed all costs.

¶60. **JUDGE CARLOS MOORE, MUNICIPAL COURT JUDGE FOR THE CITIES OF GRENADA AND CLARKSDALE, IS HEREBY REMOVED FROM THE BENCH AS OF THE ISSUANCE OF THE MANDATE, IS FINED $3,000 AND IS ASSESSED ALL COSTS.**

**RANDOLPH, C.J., COLEMAN, P.J., MAXWELL, ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶61. Judge Carlos Moore's statements at issue are discussions of broad public importance at best and ambiguous at worst. Therefore, I would find that Judge Moore's statements were protected by the First Amendment and that the Commission failed to meet the high burden of demonstrating that its interests in protecting the impartiality of the judicial system outweighed Judge Moore's First Amendment rights. Further, because this Court alone decides what conduct of a judge is sanctionable, I would find that this Court is not bound by a memorandum created by the Commission on Judicial Performance. Accordingly, I

---

[7]The Motion for Approval of Recommendation Filed by the Mississippi Commission on Judicial Performance is granted in part as outlined in this opinion.

resoundingly dissent and would dismiss the Commission's complaint.

¶62.    Article 6, Section 177A, of the Constitution of the State of Mississippi provides:

> On recommendation of the commission on judicial performance, the Supreme Court may remove from office, suspend, fine or publicly censure or reprimand any justice or judge of this state for: . . . (b) willful misconduct in office; . . . or (e) conduct prejudicial to the administration of justice which brings the judicial office into disrepute . . . .

Miss. Const. art. 6, § 177A."Though great deference is given to the Commission's findings, it is ultimately this Court's responsibility to decide whether the conduct of a judge constitutes willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute . . . ." *Miss. Comm'n on Jud. Performance v. Harris*, 131 So. 3d 1137, 1142 (Miss. 2013) (citing *Miss. Comm'n on Jud. Performance v. Sanford*, 941 So. 2d 209, 212-13 (Miss. 2006)).   "[W]e conduct a de novo review, 'giving great deference to the findings, based on clear and convincing evidence, of the recommendations of the [Commission].'" *Id.* at 1141 (quoting *Sanford*, 941 So. 2d at 212).

## I.    Whether Judge Moore's statements are protected by the First Amendment to the United States Constitution.

¶63.    Judge Moore contends that his statements are protected by the First Amendment. It is well-established that "[a] judge does not surrender First Amendment rights upon becoming a member of the judiciary . . . ." *Miss. Comm'n on Jud. Performance v. Wilkerson*, 876 So. 2d 1006, 1013 (Miss. 2004) (alteration in original) (internal quotation marks omitted) (quoting *In re Sanders*, 955 P. 2d 369, 375 (Wash. 1998)). This Court has addressed judicial speech and its relation to the First Amendment, stating:

> The Canons which guide the conduct of our judges are a necessary and

critical part of our judicial system. Disregard for the Canons leads inexorably to disrespect for the judiciary. We regard as a primary obligation of this Court the vigilant promotion of judicial ethics, which can only be accomplished by strict enforcement of the Canons. However, this Court clearly may not impose sanctions for violation of a Canon *where doing so would infringe on rights guaranteed under the First Amendment, including the freedom of speech.*

*Id.* at 1010 (emphasis added).

¶64. The speech at issue in this case involves social media. In the words of the United States Supreme Court, "[s]ocial media users employ . . . websites [such as Facebook, LinkedIn, and Twitter] to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" ***Packingham v. North Carolina***, 582 U.S. 98, 105, 137 S. Ct. 1730, 198 L. Ed. 2d 273 (2017) (quoting ***Reno v. Am. C. L. Union***, 521 U.S. 844, 870, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997)). "The fact that speech may now occur in 'cyberspace—the vast "democratic forums of the Internet" in general, and social media in particular,' does not mean that governmental regulation of that speech is beyond the reach of First Amendment analysis and scrutiny." ***Krapacs v. Bacchus***, 301 So. 3d 976, 979 (Fla. Dist. Ct. App. 2020) (quoting ***Packingham***, 582 U.S. at 104). "'[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" ***Moody v. NetChoice, LLC***, 603 U.S. 707, 710, 144 S. Ct. 2383 (2024) (quoting ***Brown v. Ent. Merchs. Ass'n***, 564 U.S. 786, 790, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011)).

### A.     Political/Public Issue Speech

¶65.    "The United States Supreme Court has held and 'frequently reaffirmed that speech on political views and public issues occupies the "highest rung of the hierarchy of First

26

Amendment values," and is entitled to special protection.'" *Wilkerson*, 876 So. 2d at 1011 (quoting *Connick v. Myers*, 461 U.S. 138, 145, 103 S. Ct. 1684, 1689, 75 L. Ed. 2d 708 (1983)). This is because "[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218, 86 S. Ct. 1434, 1437, 16 L. Ed. 2d 484 (1966). "For speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S. Ct. 209, 216, 13 L. Ed. 2d 125 (1964). Accordingly, political or public issue speech "must withstand 'strict scrutiny,' which requires the government to demonstrate that the restraint 'is (1) narrowly tailored to serve (2) a *compelling* state interest.'" *Wilkerson*, 876 So. 2d at 1011 (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 774-75, 122 S. Ct. 2528, 153 L. Ed. 2d 694 (2002)).

### i. Matter of Public Concern

¶66. "[I]n assessing whether speech by a member of the judiciary is protected political speech, [this Court] has applied the two-prong test promulgated in *Pickering v. Board of Education*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)." *Miss. Comm'n on Jud. Performance v. Osborne*, 11 So. 3d 107, 113 (Miss. 2009). The first prong of the *Pickering* test requires a reviewing court to determine "whether, in light of the content, form, and context of the speech at issue, the speech addresses a matter of legitimate public concern." *Id.* (citing *Miss. Comm'n on Jud. Performance v. Boland*, 975 So. 2d 882, 891 (Miss. 2008)). "If the speech is not deemed to be a matter of legitimate public concern, the inquiry

ends[;] otherwise, the next step of the inquiry is to balance the First Amendment rights of the public employee against the government's interest." *Id.* (citing *Boland*, 975 So. 2d at 891).

¶67.   In *Wilkerson*, a justice court judge wrote a letter to his local newspaper declaring his religious views on homosexuality and also "referred to homosexuality as an 'illness' which merited treatment, rather than punishment" in a radio interview discussing the letter. *Wilkerson*, 876 So. 2d at 1008. The judge signed the letter "'Connie Glenn Wilkerson' . . . and provided no reference to his official capacity as a judge." *Id.* This Court found that "the case before us unquestionably involves political/public interest speech." *Id.* at 1011. Therefore, the judge's speech was subject to strict scrutiny. *Id.* Accordingly, the Court held that it could not impose sanctions unless it concluded "that the restraint the Commission seeks to enforce is 'narrowly tailored' to achieve a 'compelling state interest.'" *Id.* at 1013. It concluded that the Commission's "compelling state interest: 'impartiality of the judiciary[]'" was not met by censoring the judge's announcement of his "views on gay rights." *Id.* at 1015. This Court further stated that the judge's comments exposed the judge's prejudice, which ultimately benefitted the judiciary. *Id.*

¶68.   In contrast, this Court found that the following remarks by a justice court judge were not protected under the First Amendment:

> (1) the members of Hinds County Board of Supervisors were ignorant; (2) some of the justice court judges were on the same level as those who appeared before her in court; (3) [telling a participant] to "get the hell out" of the room; and (4) that African-Americans in Hinds County could "go to hell for all I care."

*Boland*, 975 So. 2d at 891. This Court found probative that "Judge Boland was acting in her

28

capacity as a justice court judge . . . ." *Id.* at 892. This Court also rejected Judge Boland's argument that her comments were matters of public concern and found that the comments instead were "disparaging insults . . . ." *Id.* Even so, this Court found that Judge Boland's comments "expressing personal concerns about the alleged lack of educational background or demeanor of fellow judges or the alleged lack of intelligence of supervisors" and "an alleged personal attack on a team participant, or an alleged attack on residents of Hinds County" "do not rise to sanctionable offenses, as they were an expression of her personal opinion." *Id.* This Court solely addressed "whether Judge Boland's comment concerning African-Americans in Hinds County was judicial misconduct . . . ." *Id.* It concluded that "[t]he statement placed Judge Boland's impartiality at issue" and found that her conduct "constituted willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute . . . ." *Id.* at 896, 898.

¶69.    Similarly, this Court has held that a judge's commentary to a newspaper regarding "Caucasian officials and their African-American appointees in his jurisdiction is not worthy of being deemed a matter of legitimate political concern in his reelection campaign, but merely an expression of his personal animosity." *Osborne*, 11 So. 3d at 113. There, Judge Osborne stated that "[w]hite folks don't praise you unless you're a damn fool. Unless they think they can use you. If you have your own mind and know what you're doing, they don't want you around." *Id.* at 114. This Court distinguished between Judge Osborne's statements and Judge Wilkerson's statements, finding that "Judge Osborne was appearing at the meeting in his capacity as a judge—this was not a personal letter to the editor of his local paper." *Id.*

29

113. Further, "Judge Osborne's comments 'were disparaging insults and not matters of legitimate public concern.'" *Id.* at 114 (quoting *Boland*, 975 So. 2d at 892). Therefore, Judge Osborne's comments were not protected by the First Amendment. *Id.*

¶70.    In a case from the United States Court of Appeals for the Fifth Circuit, a justice of the peace in Texas wrote a letter to county officials that "attacked the district attorney's office and the county court-at-law for dismissing so many traffic ticket appeals . . . ." *Scott v. Flowers*, 910 F.2d 201, 204 (5th Cir. 1990). Scott circulated the letter "to the local press" which "prompted several newspaper articles." *Id.* The Fifth Circuit stated that it "ha[d] no difficulty in concluding that [the judge's] open letter, and the comments he made in connection with it, address matters of legitimate public concern." *Id.* at 211.

*The Kelly Clarkson Show*

¶71.    The majority first discusses Judge Moore's comments on the Kelly Clarkson show. It takes issues with Judge Moore's comment that many judges "do not look like" him and "the people that appear before them." Judge Moore expressed concern that those judges could not be empathetic toward people of color because they do not look like those people. The majority states that "[d]iscussions about racial disparity in the legal system or the desire for greater diversity in the judiciary and legal profession are certainly matters of public concern." Maj. Op. ¶ 30. The majority then asserts that "blatantly attacking an entire race's ability to exhibit a core, not just judicial but human, ability is not." Maj. Op. ¶ 30.

¶72.    But the majority reads into Judge Moore's comments and takes those comments out of context. I strongly disagree with the majority's assertion that Judge Moore's comments

30

on the Kelly Clarkson Show are an attack, much less a blatant one. In fact, Judge Moore's comments are ambiguous at worst. What is clear is that Judge Moore was invited on the Kelly Clarkson Show to discuss his Do Better ASAP (Alternative Sentencing Accountability Program), which was aimed at giving nonviolent first-time offenders a second chance to avoid entering the criminal justice system and having a criminal record. The full transcript of Judge Moore's appearance on the Kelly Clarkson Show follows:

Clarkson: So joining us now is a man deeply passionate about keeping people out of the revolving doors of justice. He's a judge in Northwest Mississippi as well as the President of the National Bar Association, the oldest and largest association made up of predominately African American judges and lawyers. A few years ago he created a program to give first time offenders second chances in super creative ways. And that makes him a rad human.

Alright everybody, say hi to the creator of Do Better ASAP Judge Carlos Moore. So . . . why is this so important for you? Why was it so important for you to do this?

Moore: You know, I always felt that if I got in a position of power I would try to make a difference. So many times African Americans get the short end of the stick. There are many judges that don't look like me and the people that appear before them. They cannot be empathetic because they don't look like the people that go before them. But I preside over two jurisdictions where there are African Americans, 85 to 90% of people look like me, and I want to give them a second chance if they qualify.

Clarkson: Yeah. So . . . will you explain to people like how legal troubles disproportionately affect, they impact African American kids in your community more so than others?

Moore: Yes. Once you get into the criminal justice system, your record follows you. And some of these people come before me, they're young people just finishing high school and I don't want them to start off with a blemish on their record. If they're a

31

non-violent youthful or first time offender I'm gonna give them a second chance. It's Do Better ASAP (Alternative Sentencing Accountability Program). Basically, if they plead guilty and accept responsibility for their infraction I allow them to have a second chance to do better ASAP.

Clarkson: Um, well, can you give us examples of your like creative ways? Like how you would help them.

Moore: I've had some to register to vote. I've had some to write an essay about the importance or the safety or the effectiveness of the vaccine. I've had some get their GED. The one that stands out the most is Chandler Wales. Chandler was a 17 year old who pled guilty to reckless driving. He was not doing well in school. He was missing days. His grades were not up to par. He did not know if he was wanting to go to college.

Clarkson: So young. . . .

Moore: So young. Yes.

Clarkson: Yeah. So what kind of changes have you seen for the people in your program, in the community like Chandler? What kind of changes have you seen?

Moore: I've seen Chandler got admitted to college. He's in college, just finished his first year at Northwest Community College.

Clarkson: And it could have gone so differently. Yeah.

Moore: He was a valedictorian of my first graduation. So we are very proud of Chandler. We gave him a scholarship, a book scholarship, $2,000 for college, and he's doing well.

Clarkson: Wow, right on. And to think like how many lives you're impacting in that sense. Not just the lives of those young men but all their family members, their kids one day, you know what I'm saying? You've changed the, that's a really cool, is that why, like why did you want to become a judge? Like, why was that your purpose?

Moore: You know, I wanted to be a lawyer. I never really thought about

being a judge but an opportunity came available. The mayor and the board appointed me to be judge. And I took the opportunity and said I would do something with it.

Clarkson:     Okay. So wait, why did you wanna be a lawyer?

Moore:        I wanted to be a lawyer because I like standing up for those voiceless people. I like to be a voice for the voiceless. Be a vanguard for justice.

Clarkson:     Yeah, I love that. I love that. I love your accent as well. Judge Moore told us about Chandler, who just finished his first year of college, which is incredible. We actually have Chandler's mom on the line and she has something to say to Judge Moore.

              . . . .

Clarkson:     Aw, I hope you feel like a super hero. It's like really cool what you're doing. And like giving a voice to people that don't have a voice. And I think, you know, especially the last two years we've heard about all the injustices and it's one of those things where people either turn a blind eye or just not listening, but things are going on and things are happening and it's really important what you're doing. Like your work is so important. So thank you so much for taking the time to come. . . .

Moore:        Thanks for having me.

*The Kelly Clarkson Show: Mississippi Judge Gives Young Offenders Second Chances Thru*

*Do Better ASAP Program* (NBC television broadcast June 22, 2022),

https://www.nbc.com/the-kelly-clarkson-show/video/mississippi-judge-gives-young-

offenders-second-chances-thru-do-better-asap-program/ACCN563397925.

¶73.    The majority considers Judge Moore words an attack. But Judge Moore stated, "[s]o

many times African Americans get the short end of the stick. There are many judges that

don't look like me and the people that appear before them. They cannot be empathetic

33

because they don't look like the people that go before them." *Id.* Empathy is defined as "the action of understanding, being aware of, being sensitive to, and vicariously experiencing the feelings, thoughts, and experience of another." *Empathy*, Merriam-Webster, https://www.merriam-webster.com/dictionary/empathy (last visited November 6, 2024). Empathy does not equate to impartiality. Although Judge Moore's statement is ambiguous, a reasonable interpretation of Judge Moore's comment is that because he is African-American and because the vast majority of the people that appear before him are also African-American, he is in a position to be empathetic, to uniquely understand the experiences of being African-American. This does not mean that Judge Moore was blatantly attacking judges of different races, and Judge Moore did not assert that judges of different races cannot be *impartial* to people who are not their same race. Empathy in judicial decisionmaking has been discussed as follows:

> [E]mpathy encourages a judge to imagine and try to understand a perspective that, for a number of reasons, is frequently overlooked in the process of a case. It is imagining, for example, the frustration and anxiety of a black man running through a ghetto neighborhood, stopped and searched by police for no apparent reason other than the fact that he is black and running through a high crime area. Or, imagining, for example, how a black child must feel when she realizes that the laws of her own country prohibit her from attending school with white children, instead insisting that she attend a separate school just for children of color. Or, it is imagining the frustrations of living and working in our communities with a profound disability; or imagining what it must be like to be a person who must cope with prejudice or hate founded simply on religion or gender or sexual orientation. It is recognizing and imagining these interests and special situations, but not fully sharing in them. Finally, it is moving beyond this empathic perspective, once achieved, to an objective judicial assessment of the situation and its significance in the legal analysis.

Catherine Gage O'Grady, *Empathy and Perspective in Judging: The Honorable William C.*

34

*Canby, Jr.*, 33 Ariz. St. L.J. 4, 13–14 (2001) (footnote omitted) (citations omitted). If Judge Moore's comments were intended to express that because he is black that he can be more uniquely empathetic to the legal or personal struggles of other black people, that is certainly not a sanctionable offense.

¶74.    A full reading of the Kelly Clarkson transcript also shows no statement of Judge Moore's indicating that he would not treat people of other races impartially. Judge Moore stated, "[b]ut I preside over two jurisdictions where there are African Americans, 85 to 90% of people look like me, and I want to give them a second chance if they qualify." Judge Moore did not say that he would only give second chances to African Americans. A review of the entire transcript makes clear that Judge Moore was on the Kelly Clarkson Show to discuss his Do Better ASAP program, which gives second chances not solely to black offenders but to any nonviolent, first-time offender that qualifies for the program.

¶75.    Further, as Judge Moore points out, his efforts with the Do Better ASAP program have also received nationally recognized, positive feedback:

> The National Judicial College (NJC) has been awarded a two-year, $1 million grant from the Walmart Foundation through the Walmart.org Center for Racial Equity to support a program that aims to reduce racial disparities in youth incarceration rates. The NJC will launch a program for educating the judiciary and articulating best practices, not only for alternative sentencing of youth offenders but also for promoting mentoring to help judges eradicate the cycle of crime and incarceration.

> Black youth are disproportionately represented in the criminal justice system. Studies have established a correlation between juvenile incarceration and long-term difficulties in future employment, education and housing opportunities, which further contribute to a likelihood of recidivism. The NJC will educate judges on alternative sentencing programs focused on addressing root causes and developing better remediation pathways for Black youth to

35

> successfully exit the justice system and to help strengthen their communities for generations to come.
>
> . . . .
>
> . . . . This initiative was partly inspired by the Alternative Sentencing Accountability Program (ASAP) led by former NBA President Carlos Moore, a judge in Mississippi. Under ASAP, Judge Moore identifies alternative sentences for non-violent, first-time offenders when circumstances warrant providing the youth offender a second chance.

Press Release, *The National Judicial College receives $1 million grant from Walmart Foundation to address racial disparities in youth incarceration*, The National Judicial College (Oct. 12, 2022), https://www.judges.org/news-and-info/the-national-judicial-college-receives-1-million-grant-from-walmart-foundation-to-address-racial-disparities-in-youth-incarceration/.

¶76. This Court in *Boland* found that a judge's statement "that African-Americans in Hinds County could 'go to hell for all I care'" was a disparaging insult and was not a matter of legitimate public concern. *Boland*, 975 So. 2d at 891, 898. In contrast, Judge Moore's discussion of his Do Better ASAP program, which gives second chances to *any* qualifying nonviolent, first-time offender, is vastly different from stating that an entire race can "go to hell."

¶77. Judge Moore discussed his motivation behind becoming an attorney and a judge. He stated that he wanted to be a voice for the voiceless, that he wanted to help people that look like him. Such a motivation for becoming an attorney or a judge is not mutually exclusive with the idea of impartiality. If a judge's motivation behind becoming an attorney or judge is because he or she wants to help eradicate poverty or wants to help children, and their

36

action reflect accordingly, such motivation is not sanctionable or deplorable. That certainly does not mean that the judge does not want to help people who have not struggled with poverty or does not want to help adults and will treat those outside their passions differently. And if Judge Moore wants to help people who look like him, it certainly does not blatantly mean that he does *not* want to help people who do not. What is clear is that this Court does not know with certainty what Judge Moore meant by his statements and that his words are ambiguous. What is also clear is that Judge Moore did not state that white people can "go to hell."

¶78.　Yet the majority misconstrues and twists Judge Moore's words and fails to look at the context in which Judge Moore spoke. I would find that Judge Moore's comments instead reflect matters of legitimate public concern.[8] Therefore, I dissent from the majority's finding that Judge Moore's statements on the Kelly Clarkson Show violate the Code of Judicial

---

[8]*See generally* Jennifer K. Elek and Andrea L. Miller, *The Evolving Science on Implicit Bias*, National Center for State Courts (March 2021), https://ncsc.contentdm.oclc.org/digital/api/collection/accessfair/id/911/page/0/inline/accessfair_911_0; Mary Smith, Hon. Michael B. Hyman, and Sarah E. Redfield, *Addressing Bias Among Judges*, State Court Report (Sept. 14, 2023), https://statecourtreport.org/our-work/analysis-opinion/addressing-bias-among-judges; Joy Milligan, *Pluralism in America: Why Judicial Diversity Improves Legal Decisions About Political Morality*, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-81-3-Milligan.pdf; Alicia Bannon and Laila Robbins, *State Supreme Court Diversity*, Brennan Center for Justice (June 2006), https://www.brennancenter.org/our-work/research-reports/state-supreme-court-diversity; Allison P. Harris, *Can Racial Diversity among Judges Affect Sentencing Outcomes?*, Cambridge University Press (June 27, 2023), https://www.cambridge.org/core/journals/american-political-science-review/article/can-racial-diversity-among-judges-affect-sentencing-outcomes/762B5A7158BC5D864E0333BB9B8C9D9C.

Conduct and from its conclusion that his comments are disparaging insults.

*The Kyle Rittenhouse Post*

¶79.    Further, the majority found that Judge Moore's statements regarding the Kyle Rittenhouse trial were "merely an expression of his personal animosity." Maj. Op. ¶ 36 (internal quotation marks omitted) (quoting ***Osborne***, 11 So. 3d at 113). Again, I disagree. Kyle Rittenhouse was a seventeen-year-old "who fatally shot two people during the unrest [in 2020] in Kenosha, Wis[consin], and [who was] acquitted of all charges in a criminal trial that divided the nation over questions about gun rights, violence at racial justice protests and vigilantism." Becky Sullivan, *Kyle Rittenhouse is acquitted of all charges in the trial over killing 2 in Kenosha*, NPR (Nov. 19, 2021), https://www.npr.org/2021/11/19/1057288807/kyle-rittenhouse-acquitted-all-charges-verdict. Judge Moore commented on the nationally publicized Rittenhouse trial and expressed his concern regarding "a greater need for black lawyers and judges in America to keep decrying the blatant inequities that exist in our criminal justice system and to keep pushing for a color blind and more equitable judicial system." During oral argument, the Commission on Judicial Performance admitted that Judge Moore's comment could have been a comment on the administration of justice and the various parties who are tasked with the administration of justice in this state. Under Canon 4B of the Code of Judicial Conduct, "[a] judge may speak, write, lecture, teach and participate in other extra-judicial activities concerning the law, the legal system, the administration of justice and non-legal subjects, subject to the requirements of this Code." Miss. Code of Jud. Conduct Canon 4B. Therefore, a judge is expressly allowed

38

to speak on the topic of the administration of justice. Moreover, "[j]udges may participate in efforts to promote the fair administration of justice, the independence of the judiciary and the integrity of the legal profession . . . ." Miss. Code of Jud. Conduct, Canon 4 cmt. Judge Moore stated that lawyers and judges must "keep pushing for a color blind and more equitable judicial system," which would, of course, promote the fair administration of justice and the integrity of the legal system.

¶80.  Judge Moore is certainly not the first judge to speak about racial disparity in the judicial and legal systems or the need for a diverse judiciary and legal profession. During a talk at Brooklyn Law School in April 2016, United States Supreme Court Justice Sonia Sotomayor spoke about the importance of greater diversity on the Supreme Court and stated that "[a] different perspective can permit you to more fully understand the arguments that are before you and help you articulate your position in a way that everyone will understand." Katie Reilly, *Justice Sotomayor Calls for More Supreme Court Diversity*, Time Magazine (Apr. 9, 2016) (internal quotation marks omitted),

https://time.com/4287655/sonia-sotomayor-supreme-court-diversity/.

¶81.  Supreme Court of North Carolina Justice Anita Earls recently filed a federal lawsuit against North Carolina's "judicial standards commission after the body opened an investigation into comments she made about the diversity of the state's judicial system . . . ." Justin Gamble, *North Carolina Supreme Court justice files lawsuit over state investigation into her comments about diversity*, CNN (Sept. 4, 2023),

https://www.cnn.com/2023/09/04/us/anita-earls-lawsuit-diversity-statements-reaj/index.html.

Justice Earls commented that the clerks to the justices lacked racial diversity and stated that she felt that female attorneys were interrupted and cut off more than their male counterparts when arguing in front of the Court. Hannah Albarazi, *North Carolina Justice Anita Earls Opens Up About Diversity*, Law360 (June 20, 2023), https://www.law360.com/articles/1687516/north-carolina-justice-anita-earls-opens-up-about-diversity. Justice Earls later dropped her lawsuit after the judicial standards commission dismissed its complaint. Mehr Sher, *Justice Earls, NC commission end legal dispute; free speech issue unresolved*, Carolina Public Press (Jan. 17, 2024), https://carolinapublicpress.org/62831/earls-nc-legal-dispute-ends-complaint-dismissed-free-speech/.

¶82.    Justice Jill Karofsky, a Wisconsin Supreme Court Justice, was the subject of a complaint filed with the Wisconsin Judicial Commission resulting from her comments during oral argument in former President Donald Trump's lawsuit attempting to overturn the results of the 2020 election. Justice Karofsky stated during oral argument that "[t]his lawsuit, Mr. Troupis, smacks of racism" and "I do not know how you can come before this court and possibly ask for a remedy that is unheard of in U.S. history. . . . It is not normal." Scott Bauer, *Trump loses Wisconsin case while arguing another one*, Associated Press (Dec. 12, 2020), https://apnews.com/article/election-2020-joe-biden-donald-trump-madison-wisconsin-e911b00569c4a3214691ecb7b84e8330. The Wisconsin judicial oversight commission later dismissed its complaint against Justice Karofsky. Wisconsin Examiner, *Wisconsin Judicial Commission dismisses complaint against Justice Jill Karofsky* (Feb. 13,

2023), https://wisconsinexaminer.com/briefs/wisconsin-judicial-commission-dismisses-complaint-against-justice-jill-karofsky/. In response, Justice Karofsky stated:

> the Judicial Code requires judges to act with impartiality towards the parties, but it does not require a judge to turn a blind eye to dangerous, bad-faith conduct by a lawyer or litigant. It is beyond reason to read the Code to require judges to be mouse-like quiet when parties are arguing in favor of a slow-motion coup.

Jill Karofsky, *What I Got for Challenging Trump's Coup Attempt From the Bench*, Slate, https://slate.com/news-and-politics/2023/02/wisconsin-supreme-court-justice-coup-challenge-story.html.

¶83. On June 8, 2020, Louisiana Supreme Court Chief Justice Bernette Joshua Johnson wrote a letter stating that protests that were occurring at that time "are the consequence of centuries of institutionalized racism that has plagued our legal system." She continued, stating that:

> As Chief Justice and chief administrator of our state's courts, I readily admit our justice system falls far short of the equality it espouses. And I see many of its worst injustices meted out in the criminal legal system. Inequities there range from courts being funded with fines levied on poor, disproportionately African American defendants, to our longtime use of Jim Crow laws to silence African American jurors and make it easier to convict African American defendants. We need only look at the glaring disparities between the rate of arrests, severity of prosecutions and lengths of sentences for drug offenses in poor and African American communities in comparison to those in wealthier White communities, to see how we are part of the problem. Is it any wonder why many people have little faith that our legal system is designed to serve them or protect them from harm? Is it any wonder why they have taken to the streets to demand that it does?

Chief Justice Bernette Joshua Johnson, *Louisiana Supreme Court Chief Justice Bernette Joshua Johnson Issues Call for Justice for All in Louisiana* (June 8, 2020),

https://www.lasc.org/Press_Release?p=2020-18. And the Washington Court of Appeals recently stated that "[a]ll members of the legal community—law enforcement, attorneys, and judges—bear responsibility for addressing racial inequities in our justice system." *State v. Horntvedt*, 539 P.3d 869, 876-77 (Wash. Ct. App. 2023).

¶84.    In *Scott*, the Fifth Circuit found that the judge "was speaking not as an employee about matters of merely private interest, but rather as 'an informed citizen regarding a matter of great public concern.'" *Scott*, 910 F.2d at 211 (quoting *Moore v. City of Kilgore, Tex.*, 877 F. 2d 364, 371 (5th Cir. 1989)). In contrast, the nature of Judge Boland's "comment was an insult to individuals in the community in which she worked as a justice court judge." *Boland*, 975 So. 2d at 892. And in *Osborne*, the "disparaging insults went well beyond the realm of protected campaign speech expressing views on disputed legal and political issues and discussing the qualifications of the judicial office for which Judge Osborne was campaigning." *Osborne*, 11 So. 3d at 114. I would find that Judge Moore's comments did not pass from protected political speech to disparaging insults.

¶85.    This conclusion becomes even clearer when considering the federal lawsuit involving judicial districts in Mississippi in which "[t]he maps used in Mississippi's judicial elections are being challenged in court for not adequately representing the state's demographics." Mississippi Public Broadcasting, *Lawsuit challenges Mississippi's judicial district lines*, https://www.mpbonline.org/blogs/news/lawsuit-challenges-mississippis-judicial-district-lines/. The lawsuit highlights the fact that "[b]lack Mississippians make up nearly 40% of the population, yet only four Black judges, all men, have served on the state supreme court

42

within the last 100 years." *Id.* Again, "speech concerning public affairs is more than self-expression; it is the essence of self-government." ***Garrison***, 379 U.S. at 74–75. Racial inequity remains a topic of high priority for America in general and for Mississippians. As such, Judge Moore should not be sanctioned for expressing his frustrations regarding his perceived inequities in the legal system, which, especially as evidenced by recent lawsuits, are matters of legitimate public concern.

¶86.    As stated in ***Wilkerson***, although Judge Moore's statements perhaps "were not appreciated by many of the listeners, . . . it is in that context that the First Amendment plays its most important function." ***Wilkerson***, 876 So. 2d at 1014 (quoting ***In re Hey***, 452 S.E.2d 24, 33-34 (W. Va. 1994)).[9] Accordingly, looking at the context and form of Judge Moore's

---

[9]I also note Justice Carlson's dissent in ***Wilkerson***:

[W]hen the judge in today's case stated that certain individuals in our society were sick and that they all needed to be indiscriminately placed in mental institutions, he crossed over the line!

. . . .

[T]he judge in the case sub judice did more than express his views on the administration of justice or a matter of public interest. His declaration[s] . . . clearly and convincingly lead[] the public to conclude that he entertains a bias against an entire class of individuals and precipitating a reasonable fear that their pleas, arguments and testimony before his court will not be considered with the impartiality demanded of a judge.

. . . .

In making statements, while holding judicial office, declaring that all citizens of a particular class are mentally ill and should be placed in mental institutions, the judge now before us has transgressed the protection of the First Amendment which preserves the rights of all citizens to speak out on

comments, his comments at worst were ambiguous and at best addressed matters of legitimate public concern.

### ii. Balance between First Amendment Rights and the Government

¶87. "If the court determines that the employee's speech addresses a matter of public concern, it then must balance the employee's first amendment rights against the governmental employer's countervailing interest in promoting the efficient performance of its normal functions." *Scott*, 910 F.2d at 211.

¶88. The Commission did not address Judge Moore's First Amendment arguments in its brief before this Court. But the Commission asserts that Judge Moore's actions have demeaned the judicial office, have cast doubt on his ability to act impartially, and have interfered with the proper performance of his judicial duties.

¶89. This Court previously has stated that the Commission has a "compelling state interest" in maintaining the "impartiality of the judiciary." *Wilkerson*, 876 So. 2d at 1015 (internal quotation marks omitted). Further, although Judge Moore was appointed, not elected, the Fifth Circuit has held that "the state may restrict the speech of elected *judges* in ways that it may not restrict the speech of other elected officials." *Scott*, 910 F.2d at 212. Even so, the Fifth Circuit noted that its previous holding "was a narrow one" and involved "fairly limited intrusions into the political speech of elected judges." *Id.* Yet when a reprimand "touches

---

matters of public concern.

*Wilkerson*, 876 So. 2d at 1023 (Carlson, J., dissenting). Contrastingly, Judge Moore's comments did not "cross[] over the line[.]" *Id.*

44

upon 'core first amendment values[,]' . . . the Commission must carry a very difficult burden in order to demonstrate that its concededly legitimate interest in protecting the efficiency and impartiality of the state judicial system outweighs [a judge's] first amendment rights." *Id.* (citing *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987)).

¶90.    The Commission wholly failed to articulate a legitimate reason why its "interest in protecting the efficiency and impartiality of the state judicial system" overrode Judge Moore's First Amendment rights. The Commission likened Judge Moore's comments to Judge Boland's and Judge Osborne's and argues that his comments were also "racially charged." Yet, as discussed above, the comments at issue in those cases can be distinguished. Further, the United States Supreme Court has stated that "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern. '[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Rankin*, 483 U.S. at 2898 (second and third alterations in original) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)).

¶91.    Because the Commission has failed to articulate how Judge Moore's comments interfered with the state's interest in promoting the efficient performance of its normal functions, the second *Pickering* factor also leans in Judge Moore's favor. Accordingly, I would find that strict scrutiny is warranted.

        **B.    Strict Scrutiny**

45

¶92. Again, "[u]nder the strict-scrutiny test, respondents have the burden to prove that the [speech restriction] is (1) narrowly tailored, to serve (2) a compelling state interest." *White*, 536 U.S. at 774-75 (citing *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 498 U.S. 214, 222, 109 S. Ct. 1013, 103 L. Ed. 2d 271 (1989)). To prove that the speech restriction is narrowly tailored, the Commission "must demonstrate that it does not 'unnecessarily circumscrib[e] protected expression.'" *Id.* at 775 (alteration in original) (quoting *Brown v. Hartlage*, 456 U.S. 45, 54, 102 S. Ct. 1523, 71 L. Ed. 2d 732 (1982)).

¶93. The United States Supreme Court determined that Minnesota's announce clause, which prohibited judicial candidates from "announc[ing] his or her views on disputed legal or political issues[,]" *id.* at 768 (internal quotation marks omitted) (quoting Minn. Code of Jud. Conduct Canon 5(A)(3)(d)(i)), was subject to strict scrutiny because "the announce clause both prohibits speech on the basis of its content and burdens a category of speech that is 'at the core of our First Amendment freedoms'—speech about the qualifications of candidates for public office." *Id.* at 774 (quoting *Republican Party of Minn. v. Kelly*, 247 F.3d 854, 861, 863 (8th Cir. 2001)). The Supreme Court took into consideration the argument that the clause was necessary for "preserving the impartiality of the state judiciary and preserving the appearance of the impartiality of the state judiciary." *Id.* at 775 (citing *Kelly*, 247 F.3d at 867. It first determined that the term "impartiality" was vague and discussed the possible meanings of the word. *Id.* The Supreme Court rejected that the announce clause was narrowly tailored to serve the first meaning of impartiality, reasoning:

> One meaning of 'impartiality' in the judicial context—and of course its root meaning—is the lack of bias for or against either *party* to the proceeding.

46

Impartiality in this sense assures equal application of the law. That is, it guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party. This is the traditional sense in which the term is used. . . .

We think it plain that the announce clause is not narrowly tailored to serve impartiality (or the appearance of impartiality) in this sense. Indeed, the clause is barely tailored to serve that interest *at all*, inasmuch as it does not restrict speech for or against particular *parties*, but rather speech for or against particular *issues*. To be sure, when a case arises that turns on a legal issue on which the judge (as a candidate) has taken a particular stand, the party taking the opposite stand is likely to lose. But not because of any bias against that party, or favoritism toward the other party. *Any* party taking that position is just as likely to lose. The judge is applying the law (as he sees it) evenhandedly.

*Id.* at 776-77 (citations omitted). The Supreme Court moved on to the second potential meaning of the word and stated:

It is perhaps possible to use the term 'impartiality' in the judicial context (though this is certainly not a common usage) to mean lack of preconception in favor of or against a particular *legal view*. This sort of impartiality would be concerned, not with guaranteeing litigants equal application of the law, but rather with guaranteeing them an equal chance to persuade the court on the legal points in their case. Impartiality in this sense may well be an interest served by the announce clause, but it is not a *compelling* state interest, as strict scrutiny requires. A judge's lack of predisposition regarding the relevant legal issues in a case has never been though a necessary component of equal justice, and with good reason. For one thing, it is virtually impossible to find a judge who does not have preconceptions about the law. . . . Indeed, even if it were possible to select judges who did not have preconceived views on legal issues, it would hardly be desirable to do so. . . . And since avoiding judicial preconceptions on legal issues is neither possible nor desirable, pretending otherwise by attempting to preserve the 'appearance' of that type of impartiality can hardly be a compelling state interest either.

*Id.* at 777-78.

¶94.    Lastly, impartiality in the "open-mindedness" context was discussed:

A third possible meaning of 'impartiality' (again not a common one) might be described as open-mindedness. This quality in a judge demands, not that he

47

have no preconceptions on legal issues, but that he be willing to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case. This sort of impartiality seeks to guarantee each litigant, not an *equal* chance to win the legal points in the case, but at least *some* chance of doing so. It may well be that impartiality in this sense, and the appearance of it, are desirable in the judiciary, but we need not pursue that inquiry, since we do not believe the Minnesota Supreme Court adopted the announce clause for that purpose.

*Id.* at 778. The Supreme Court acknowledged that "judges often state their views on disputed legal issues outside the context of adjudication—in classes that they conduct, and in books and speeches" and that "the ABA Codes of Judicial Conduct . . . not only permits but encourages this." *Id.* at 779. It then continued, stating: "the notion that the special context of electioneering justifies an *abridgment* of the right to speak out on disputed issues sets our First Amendment jurisprudence on its head." *Id.* at 781. In fact, "[t]he role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance." *Id.* at 781-82 (internal quotation marks omitted) (quoting *Wood v. Georgia*, 370 U.S. 375, 395, 82 S. Ct. 1364, 8 L. Ed. 2d 569 (1962)). Thus, the Supreme Court held that Minnesota's announce clause violated the First Amendment. *Id.* at 788.

¶95.    In 2015, the Supreme Court again looked at judicial speech in the First Amendment context and determined that the First Amendment permitted the prohibiting of judges and judicial candidates from personally soliciting funds for their campaigns. *Williams-Yulee v. Fla.*, 575 U.S. 433, 437, 135 S. Ct. 1656, 191 L. Ed. 2d 570 (2015). Once more, the Supreme Court applied strict scrutiny and held that "[a] State may restrict the speech of a judicial candidate only if the restriction is narrowly tailored to serve a compelling interest." *Id.* at

48

444. The *Williams-Yulee* Court reemphasized that "'it is the rare case' in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest." *Id.* (quoting *Burson v. Freeman*, 504 U.S. 191, 211, 112 S. Ct. 1846, 119 L. Ed. 2d 5 (1992) (plurality opinion)). Yet personally soliciting campaign funds protects the judiciary because "[j]udges, charged with exercising strict neutrality and independence, cannot supplicate campaign donors without diminishing public confidence in judicial integrity." *Id.* at 445.

¶96. The Supreme Court found that the prohibition "restricts a narrow slice of speech" because it "leaves judicial candidates free to discuss any issue with any person at any time." *Id.* at 452. It reasoned:

> Candidates can write letters, give speeches, and put up billboards. They can contact potential supporters in person, on the phone, or online. They can promote their campaigns on radio, television, or other media. They cannot say, "Please give me money." They can, however, direct their campaign committees to do so. Whatever else may be said of the Canon, it is surely not a "wildly disproportionate restriction on speech."

*Id.* at 452-53 (citation omitted). Further, "[s]tates have a compelling interest in preserving public confidence in their judiciaries." *Id.* at 457. Therefore, because the prohibition of judges and judicial candidates from personally soliciting campaign funds serves a compelling government interest, "the First Amendment pose[d] no obstacle." *Id.* at 455.

¶97. The instant case involves a sitting judge's speech as opposed to a judicial candidates' speech. The Fifth Circuit, which addressed a sitting judge's speech, also recognized that a judicial commission "carr[ies] a very difficult burden in order to demonstrate that its concededly legitimate interest in protecting the efficiency and impartiality of the state judicial system outweighs [a judge's] first amendment rights." *Scott*, 910 F.2d at 212. The Fifth

49

Circuit went on to conclude that the Commission failed to meet its burden because "[n]either in its brief nor at oral argument was the Commission able to explain precisely how Scott's public criticisms would impede the goals of promoting an efficient and impartial judiciary . . . ." *Id.* at 213. Therefore, "the Commission could not constitutionally reprimand Scott for making public statements critical of the court-at-law and the district attorney's office . . . ." *Id.*

¶98.    The Fifth Circuit also has applied strict scrutiny to the censure of a judge's conduct "during the court's normal business hours, in holding a press conference in his courtroom, while wearing his judicial robe, in order to read a prepared statement concerning [a pending case] and his personal feelings and criticisms about the conduct of [an attorney involved in the case] and his clients . . . ." *Jenevein v. Willing*, 493 F.3d 551, 559 (5th Cir. 2007). It wrote:

> An impartial judiciary, while a protean term, translates here as the state's interest in achieving a courtroom that at least on entry of its robed judge becomes a neutral and disinterested temple, in appearance and fact—an institution of integrity, the essential and cementing force of the rule of law. That this interest is compelling cannot be gainsaid.

*Id.* The court went on to state that "[t]o leave judges speechless, throttled for publicly addressing abuse of the judicial process by practicing lawyers, ill serves the laudable goal of promoting judicial efficiency and impartiality." *Id.* at 560. Therefore, the Fifth Circuit rejected the commission's censure of Judge Jenevein for the content of his speech, finding that "the narrow tailoring of strict scrutiny is not met by deploying an elusive and overly-broad interest in avoiding the 'appearance of impropriety.'" *Id.* Yet the Fifth Circuit stated

that the censure order survived strict scrutiny in part and held that "it is within the Commission's power to censure Judge Jenevein for wielding state electronic equipment and choosing to don his robe and conduct his press conference in the courtroom, instead of walking to a public forum a block away." *Id.* at 561.

¶99. Judge Moore cites ***Griffen v. Arkansas Judicial Discipline and Disability Commission***, 130 S.W.3d 524, 525 (Ark. 2003), in which the Arkansas Supreme Court found that a canon in the Arkansas Code of Judicial Conduct violated the First Amendment. There, an Arkansas Court of Appeals judge "appeared before the Arkansas Legislative Black Caucus in a public meeting called to discuss the recent dismissal of" a basketball coach at an Arkansas university. *Id.* at 525-26. Judge Griffen identified himself as a court of appeals judge and voiced his concerns on the lack of African-American representation at the university as well concerns regarding the disparate treatment of African-Americans at colleges and universities in the state. *Id.* at 526-27. The Arkansas Judicial Commission determined that Judge Griffen violated a canon stating that a judge could not appear at public hearings before executive or legislative bodies "except on matters concerning the law, the legal system or the administration of justice or except when acting pro se in a matter involving the judge or the judge's interests." *Id.* at 528 (internal quotation mark omitted) (quoting Ark. Code of Jud Conduct Canon 4C(1)). The Arkansas Supreme Court applied strict scrutiny and found that "because the exception relating to a judge's interests is vague and indefinite and is not narrowly tailored so as to avoid an infringement on free speech[,]" it violated Judge Griffen's First Amendment rights. *Id.* at 538.

¶100. The Washington Supreme Court has held that:

> Judges do not forfeit the right to freedom of speech when they assume office. They do agree, however, that the right must be balanced against the public's legitimate expectations of judicial impartiality. But the constitutional concern weighs more heavily in that balance, requiring clear and convincing evidence of speech or conduct that casts doubt on a judge's integrity, independence, or impartiality in order to justify placing a restriction on that right.

*In re Sanders*, 955 P.2d at 370. There, a Washington Supreme Court justice attended a pro-life rally during which he addressed the crowd, identified himself as a judge, thanked his electors, and expressed his views that "[n]othing is . . . more fundamental in our legal system than the preservation and protection of innocent human life." *Id.* at 371. The Washington court applied strict scrutiny and found that:

> A judge's right of free speech is subject to limitation by the Canons of Judicial Conduct. However, those limitations must not be interpreted in the individual case to go so far as to permit sanctioning speech and conduct that does not clearly and convincingly lead to the conclusion that the words and actions call into question the integrity and impartiality of the judge.

*Id.* at 377.

¶101. Similar to *Scott*, the Commission in this case does not address the First Amendment, strict scrutiny, or a compelling state interest in its briefing.

> The Commission contends that Judge Moore:

> made disparaging insults, that were racially divisive, utilizing his position as a judge . . . . Blasting racially disparaging divisive comments to the world wide web renders anyone who reads Judge Carlos Moore's comments his target and sufferer of harm. His comments put the general public in doubt of the impartiality of the Mississippi judiciary, specifically Judge Moore himself.

¶102. But protecting an impartial judiciary does not negate Judge Moore's right to speak about matters of legitimate public concern, including his opinions on the lack of racial

diversity in the judicial and legal system. Further, the Commission has failed to explain how Judge Moore's ability to empathize with fellow African Americans affects the impartiality of the judicial system. This is not the rare case in which the state has demonstrated its narrowly tailored restriction. The Commission's conclusory statements fail to establish its "very difficult burden" to show that its interest in protecting the impartiality of the judicial system outweighs Judge Moore's First Amendment rights. *Scott*, 910 F.2d at 212.

¶103. The Commission states that this Court previously has upheld a public reprimand, suspension, and fine when a judge "made comments to the local newspaper in an attempt to explain his actions and justify [a defendant's] incarceration." *Miss. Comm'n on Jud. Performance v. Patton*, 57 So. 3d 626, 629 n.10 (Miss. 2011). The only reference to the newspaper comments in the *Patton* case, however, were in a footnote, and this Court specifically stated that "[w]e note that the record contains no facts that support a violation of Canon 3B(9), which generally prohibits a judge and his court personnel from publicly commenting on a pending case." *Id.* The *Patton* Court sanctioned Judge Patton for "engaging in ex parte communications, misusing his contempt power, failing to properly notice hearings, granting relief not requested, and issuing a search warrant without legal authority . . . ." *Id.* at 628.

¶104. Further, the Commission cites *Mississippi Commission on Judicial Performance v. Clinkscales*, 192 So. 3d 997, 999-1000 (Miss. 2016) (internal quotation marks omitted), in which Judge Clinkscales posted on social media: "Cast your vote in the Senate District 16 Special Election. I will be voting for Angela Turner Lairy! . . . Let's not lose this seat!" Judge

53

Clinkscales did not dispute that her comment violated Mississippi Code of Judicial Conduct Canon 5(A)(1), which prohibits a judge from publicly endorsing a candidate for public office. *Id.* at 1001. Moreover, Judge Clinkscales "gave an interview to a local newspaper in which she admittedly gave misleading and deceptive responses to questions about her arrest." *Id.* at 1000. This Court found that "Clinkscales's extrajudicial acts of publicly endorsing a political candidate and giving misleading answers in a newspaper interview cast reasonable doubt on her ability to act impartially as a judge and have demeaned the public office." *Id.* at 1003.

¶105. Judge Moore's comments are dissimilar. The Commission did not articulate how Judge Moore's comments impeded the goals of promoting an efficient and impartial judiciary. He did not give misleading statements to the press that questioned his impartiality. He instead posted on social media his opinion that the legal profession could benefit from more black lawyers and judges. He also stated that he could be empathetic toward people that look like him. Importantly, he did not state that he would not be empathetic toward people that do not.

¶106. Although not a case on judicial speech, the United States Supreme Court recently looked at the relationship between the First Amendment and social media:

> But a State may not interfere with private actors' speech to advance its own vision of ideological balance. States (and their citizens) are of course right to want an expressive realm in which the public has access to a wide range of views. That is, indeed, a fundamental aim of the First Amendment. But the way the First Amendment achieves that goal is by preventing *the government* from "tilt[ing] public debate in a preferred direction."*Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578-579, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011). It is not by licensing the government to stop *private actors* from speaking as they

54

wish and preferring some views over others. . . . [**Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston**, 515 U.S. 557, 577, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995)]. In a better world, there would be fewer inequities in speech opportunities; and the government can take many steps to bring that world closer. But it cannot prohibit speech to improve or better balance the speech market. On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana. That is why we have said in so many contexts that the government may not "restrict the speech of some elements of our society in order to enhance the relative voice of others." **Buckley v. Valeo**, 424 U.S. 1, 48-49, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976). That unadorned interest is not "unrelated to the suppression of free expression," and the government may not pursue it consistent with the First Amendment.

**Moody v. NetChoice, LLC**, 603 U.S. 707, 741-42, 144 S. Ct. 2383, 2419 L. Ed. 2d 1075 (2024). As in **Wilkerson**, the Commission's "burden here is to demonstrate that a 'compelling state interest' will be achieved by applying the Canon to sanction judges who speak their views about" the lack of diversity in the legal and judicial system and the ability to empathize with the vast majority of a judge's constituents. **Wilkerson**, 876 So. 2d at 1014-15. The Commission failed to meet that burden.

## II.  Whether Judge Moore committed misconduct.

¶107.  Willful misconduct in office is:

the improper or wrong use of power of his office by a judge acting intentionally or with gross unconcern for his conduct and generally in bad faith. It involves more than an error of judgment or a mere lack of diligence. Necessarily, the term would encompass conduct involving moral turpitude, dishonesty, or corruption, and also any knowing misuse of the office, whatever the motive. However, these elements are not necessary to a finding of bad faith. A specific intent to use the powers of judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith . . . .

Willful misconduct in office of necessity is conduct prejudicial to the

administration of justice which brings the judicial office into disrepute. However, a judge may also, through negligence or ignorance not amounting to bad faith, behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute.

*Miss. Comm'n on Jud. Performance v. Curry*, 249 So. 3d 369, 374 (Miss. 2018) (quoting

*Miss. Comm'n on Jud. Performance v. Harris*, 131 So. 3d 1137, 1142 (Miss. 2013)).

¶108. The Commission found that Judge Moore's actions violated Canons 1, 2A, 3B(5), 3B(9), and 4A of the Code of Judicial Conduct. "Violations of canons of the Code of Judicial Conduct can amount to a violation of article 6, section 177A, of the Mississippi Constitution when the judge's actions constitute 'wilful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute.'" *Miss. Comm'n on Jud. Performance v. Moore*, 356 So. 3d 122, 127 (Miss. 2023) (quoting *Miss. Comm'n on Jud. Performance v. Fowlkes*, 121 So. 3d 904, 907 (Miss. 2013)).

¶109. The Commission contends that Judge Moore committed misconduct by violating Memorandum of Understanding (MOU) 1. The majority finds that the MOU is an enforceable document and determines that "Judge Moore's comments regarding the Rittenhouse trial clearly and unequivocally violated the terms of his agreed MOU with the Commission." Maj. Op. ¶ 42. But this Court is not bound by an MOU between the Commission and a judge. *Cf. Miss. Comm'n on Jud. Performance v. DeLaughter*, 29 So. 3d 750, 752-53 (Miss. 2010). Finding that the Commission may create a memorandum that determines whether the conduct of a judge is sanctionable allows the Commission to circumvent this Court and exceeds the Commission's constitutional authority. "It has been adjudicated and recognized that the Mississippi Commission on Judicial Performance does

not have the authority to impose sanctions upon a judge, only to make recommendations."

*In re Collins*, 524 So. 2d 553, 560 (Miss. 1987). This Court may take into consideration any memorandum created by the Commission, but it certainly is not binding.

¶110. Moreover, this Court previously has dismissed with prejudice judicial performance proceedings involving Judge Gay Polk-Payton, a justice court judge, who had maintained a social media presence employing the username "JudgeCutie." En Banc Order, *Miss. Comm'n on Jud. Performance v. Polk-Payton*, No. 2016-JP-01685-SCT (Miss. June 15, 2017). The Commission alleged that Judge Polk-Payton had violated Canon 2A by posting numerous times in her judicial robe, and while using the username "JudgeCutie." There, the Commission alleged that Judge Polk-Payton

> maintained four Facebook pages, a Youtube account, a Twitter account, and an Instagram account. [Her] username on Instagram and Twitter was 'Judge Cutie'. While posting on these numerous sites, [Judge Polk-Payton] posed half-robed in promotional materials, published posts about sitting on the bench with unclear hair after going to the gym, and posted a photograph wearing her robe which she titled #myuniform, to cite a few examples.

Brief on Behalf of the Mississippi Commission on Judicial Performance, *Miss. Comm'n on Jud. Performance v. Polk-Payton*, No. 2016-JP-01685-SCT (filed Mar. 6, 2017).

¶111. The Commission additionally alleged that Judge Polk-Payton had "written inflammatory and controversial political posts[,]" namely:

> I became a judge so that I could do my part [to] restore some integrity to the criminal justice system. I work hard so that by ALWAYS following the law . . . whether I agree with the law or not. We will never have a fair system of justice until private citizens stand up and honor their duty by serving as jurors for their fellow citizens AND following the law once they are sworn in as part of a petit jury. In Florida, the guilty go free but in Mississippi, those that are not guilty are convicted. Jurors and judges are the gatekeepers to the

Constitution. If you can't trust us to follow the law, there can be no justice and where there is no justice, there will be no peace. #wholeftthegateopen[10]

*Id.*

¶112.  Following oral argument, this Court found that "no violation of the Mississippi Code of Judicial Conduct . . . has been proven by clear and convincing evidence " and dismissed the proceedings with prejudice. En Banc Order, ***Miss. Comm'n on Jud. Performance v. Polk-Payton***, No. 2016-JP-01685-SCT (Miss. June 15, 2017). Accordingly, based on this Court's prior action, I would find that Judge Moore did not commit misconduct by failing to comply with MOU 1.

## CONCLUSION

¶113.  Because Judge Moore's comments are protected by the First Amendment and because they do not violate the Mississippi Code of Judicial Conduct, I would dismiss the Commission's complaint against Judge Moore.[11] Therefore, I dissent.

---

[10]This post was allegedly in reference to the death of seventeen-year-old Trayvon Martin, another nationally publicized matter that incited discussions about racial and structural inequity.

[11]It is well established that "[t]he Supreme Court has exclusive jurisdiction over attorney discipline matters." ***Miss. Bar v. Ogletree***, 226 So. 3d 79, 82 (Miss. 2015). Therefore, because the Rules of Discipline of the Mississippi State Bar provide thirty days for an attorney to appeal a judgment of the Complaint Tribunal, any decision made by the Complaint Tribunal within that time period is not final. Accordingly, I question the relevance of the majority's footnote six.